**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| CASCADIA WILDLANDS, an Oregon non-profit corporation; OREGON WILD, an Oregon non-profit corporation; UMPQUA WATERSHEDS, INC., an Oregon non-profit corporation, | No. 14-35553 |
| | D.C. No. 6:13-cv-01559-TC |
| Plaintiffs - Appellants, | |
| v. | OPINION |
| BUREAU OF INDIAN AFFAIRS, an agency of the United States Department of the Interior, | |
| Defendant - Appellee, | |
| and, | |
| COQUILLE INDIAN TRIBE, a federally recognized Indian tribe, | |
| Intervenor-Defendant - Appellee. | |

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted February 5, 2015
Seattle, Washington

Before: Raymond C. Fisher, Carlos T. Bea and Mary H. Murguia, Circuit Judges.

Opinion by Judge Fisher

FISHER, Circuit Judge:

Cascadia Wildlands, Oregon Wild and Umpqua Watersheds (collectively, Cascadia) challenge the Bureau of Indian Affairs' (BIA) approval of the Middle Forks Kokwel timber sale (the Kokwel Project), a plan by the Coquille Indian Tribe (the Tribe) to harvest 268 acres of timber in the Coquille Forest in southwest Oregon. Cascadia argues the BIA violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, because it did not adequately consider the cumulative environmental impact of the Kokwel Project in light of a previously approved harvest, the Alder/Rasler Project, on adjacent and overlapping land. Cascadia also argues the Kokwel Project violates the Coquille Restoration Act (CRA), 25 U.S.C. § 715 *et seq.*, because the project is inconsistent with the U.S. Fish and Wildlife Service's (FWS) Recovery Plan for the northern spotted owl.

The district court granted summary judgment to the BIA and the Tribe on both claims.[1] We have jurisdiction under 28 U.S.C. § 1291, and we affirm. First, the BIA and the Tribe did not violate NEPA by aggregating the Alder/Rasler Project, which had been approved, but not yet completed, as part of the

---

[1] Cascadia named only the BIA as a defendant. The Tribe intervened as a defendant in the district court.

environmental baseline against which the incremental impact of the Kokwel

Project was considered. Second, the CRA does not require compliance with the

Recovery Plan for the northern spotted owl.

## BACKGROUND

The Coquille Forest comprises 5,410 acres of land along the

southwest Oregon coast that was restored to the Coquille Indian Tribe in 1996 by

an amendment to the Coquille Restoration Act. *See* 25 U.S.C. § 715c. Under the

CRA, the forest is held in trust by the federal government and managed for the

benefit of the Tribe. *See id.* § 715c(b), (d)(5).

In 2011 and 2013, the BIA approved two different proposals by the Tribe to

harvest timber in the Coquille Forest. In 2011, the BIA approved the Alder/Rasler

Project, which called for 270 acres of regeneration harvest, 52 acres of density

management and 56 acres of commercial thinning between 2011 and 2016.[2] The

purposes of the Alder/Rasler Project were to generate money for the Tribe and

manage forest growth. The Alder/Rasler Project also called for the construction of

3.21 miles of roads in the forest. The BIA and the Tribe conducted an

---

[2] Regeneration harvest would involve clearing 85 to 90 percent of stands, with the intent of developing a new stand. Commercial thinning and density management would involve reducing stand density by about 60 percent, with the intent of promoting healthy forest conditions, and increasing diversity, complexity and productivity of the stand and the riparian area.

Environmental Assessment (EA), which estimated the project would create between 44 and 220 jobs and over $10.5 million in revenue through the sale of 22.44 million board feet of timber.

The EA also found the Alder/Rasler Project likely would adversely affect the northern spotted owl, an endangered species living in the Coquille Forest, by removing 270 acres of suitable habitat. The EA noted, however, that there were no occupied owl habitats within the project area, and no owl nest sites within 1.5 miles of the project area. Based on the EA, the BIA issued a Finding of No Significant Impact (FONSI) and approved the project in February 2011, without conducting an Environmental Impact Statement (EIS).

In 2013, the BIA approved a second project – the Kokwel Project – to conduct an additional 268 acres of regeneration harvest, 221 acres of commercial thinning and 42 acres of density management in the Coquille Forest over 10 years. The Kokwel Project was planned on land adjacent to, and overlapping with, the Alder/Rasler Project. The primary purpose of the Kokwel Project was to generate money for the Tribe. The BIA and the Tribe conducted an EA, which estimated the Kokwel Project would create 242 direct jobs, 532 indirect jobs and over $8 million in revenue through the sale of 13.9 million board feet of timber.

4

FWS performed a Biological Assessment and concluded the Kokwel Project likely would adversely affect the northern spotted owl, and would "take" up to 14 northern spotted owls at four sites.[3] Therefore, FWS concluded the Kokwel Project was inconsistent with its Recovery Plan for the northern spotted owl.[4] The Recovery Plan calls for the conservation of spotted owl habitat "to provide additional demographic support to the spotted owl population," and directs land managers to work with FWS to "maintain and restore" particularly "high-quality spotted owl habitat stands." FWS also found, however, that "[b]ecause there will be less than one percent of [nesting, roosting and foresting habitat] loss in the 43,000 acre . . . analysis area, . . . this habitat loss will not significantly impact the provincial habitat conditions that provide for spotted owls," or "jeopardize the continued existence of the spotted owl."

In the EA, the BIA and the Tribe agreed with the FWS that the Kokwel Project was likely to adversely affect the northern spotted owl by removing 268

---

[3] Under the Endangered Species Act, "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

[4] The Recovery Plan was created pursuant to the Endangered Species Act, which requires the Secretary of the Interior to "develop and implement [recovery plans] for the conservation and survival of endangered species and threatened species listed pursuant to this section." 16 U.S.C. § 1533(f)(1).

acres of suitable habitat. The EA then analyzed the cumulative impact of the

Kokwel Project by comparing it against an environmental baseline, or "No Action

Alternative." The No Action Alternative described the "existing condition and the

continuing trends," assuming "[o]ngoing activities would continue to occur on

existing projects," including "other projects covered by earlier decision records."

The EA explained that it would aggregate other projects into the No Action

Alternative, rather than individually discuss them:

> The following descriptions of the No Action Alternative and the Proposed Action assume the combined relevant effects of all past actions. It is not necessary to individually identify or catalog these past actions as the description of the affected environment incorporates all those actions. For the cumulative effects analysis the description of the potential resulting impacts is the cumulative effect of all past, present and reasonably foreseeable actions. Reasonably foreseeable future actions are assumed to be the same for the No Action as well as the Proposed Action. Stands . . . are expected to be selectively harvested approximately every 60 to 80 years . . . . Current timber management on the surrounding private land is more intensive and occurs on a larger scale at rotations as short as 30 to 40 years. . . . Table 8 lists treatments proposed for the foreseeable future on [the Tribe's] lands in the analysis area that will be considered in the following resource-specific cumulative impact discussions. Other incidental use of the [Tribe's] lands such as recreational use is expected to continue at rates similar to those of the past ten years.

Table 8 listed only one treatment proposed for the foreseeable future: the

Alder/Rasler Project. The EA's resource-specific cumulative impact discussions

did not individually analyze the impact of any specific past, present or reasonably

6

foreseeable action. With respect to the northern spotted owl, the EA said the Middle Fork Coquille River watershed, which contains the Coquille Forest, has approximately 42,587 acres of spotted-owl-habitat-capable habitat, and approximately 28,108 acres of current nesting, roosting and foraging habitat. The EA presented a table, called "Impacts of the proposed action on [northern spotted owl] nest patches, core areas, and home ranges." The table compared "current" acres of northern spotted owl habitat, elsewhere listed as "pre-harvest" acres, with "post" acres. The table showed the Kokwel Project would not reduce any northern spotted owl habitat within a "nest patch" (300 meters) or "core area" (half mile), and would reduce habitat within the "home ranges" (1.3 miles) of four historic owl sites from 2,985 to 2,718 acres. Thus, the EA concluded the Kokwel Project "would reduce the amount of [nesting, roosting and foraging] habitat within [northern spotted owl] home ranges by a cumulative of approximately seven percent.'"

Based on these data, the EA concluded the "cumulative effects" from the Kokwel Project and other "foreseeable projects" "would not appreciably diminish spotted owl suitable habitat." It explained, "[m]ost of the owl core areas occur on [Bureau of Land Management] lands within the watershed; these areas are not expected to change substantially over time." Furthermore, though the project

7

would have an incremental impact of reducing habitat by seven percent, the EA also found, "[o]verall, the habitat would benefit from opening of the canopy, encouraging development of a multi-layered canopy and encouraging tree and understory growth."

Relying on the EA, the BIA in February 2013 issued a FONSI and approved the project, without conducting an EIS. Cascadia challenged the BIA's decision in the district court, and the court granted summary judgment to the BIA and the Tribe. Cascadia appeals.

**STANDARD OF REVIEW**

We review the district court's grant of summary judgment de novo. *See Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 994 (9th Cir. 2013). We review Cascadia's NEPA and CRA claims under the Administrative Procedures Act (APA). *See id*. Under the APA, an agency decision will be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Review under the arbitrary and capricious standard is narrow, and we do not substitute our judgment for that of the agency." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (alterations omitted) (quoting *Lands Council v. McNair (Lands Council II)*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Natural Res. Def. Council, Inc.*,

8

555 U.S. 7, 20 (2008)) (internal quotation marks omitted). "Rather, we will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. (quoting *Lands Council II*, 537 F.3d at 987) (internal quotation marks omitted).

## DISCUSSION

### I.     NEPA

Cascadia argues the BIA and the Tribe violated NEPA because they did not adequately consider the cumulative impacts of the Kokwel Project in light of the Alder/Rasler Project. "The purpose of NEPA is to require disclosure of relevant environmental considerations that were given a 'hard look' by the agency, and thereby to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). To that end, "NEPA imposes procedural requirements, but not substantive outcomes, on agency action." *Id*. at 1026.

NEPA requires the preparation of an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "As a preliminary step, an agency may prepare an EA to decide whether the environmental impact of a proposed action is significant enough to warrant preparation of an EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citing 40 C.F.R. § 1508.9).

An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1508.9(a). "If an agency decides not to prepare an EIS, it must supply a 'convincing statement of reasons' to explain why a project's impacts are insignificant. 'The statement of reasons is crucial to determining whether the agency took a "hard look" at the potential environmental impact of a project.'" *Blue Mountains Biodiversity Project*, 161 F.3d at 1212 (citation omitted) (quoting *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988)).

To determine whether a proposed action will significantly impact the human environment, NEPA directs agencies to consider "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). "Significance exists if it is reasonable to anticipate a

10

cumulatively significant impact on the environment." *Id*. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. . . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7 (emphasis removed).

"[T]he general rule under NEPA is that, in assessing cumulative effects, the [agency] must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment." *Lands Council*, 395 F.3d at 1028. An agency, however, may satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured. *See Castaneda*, 574 F.3d at 666-67; *League of Wilderness Defenders – Blue Mountains Biodiversity Project v. U.S. Forest Serv. (LOWD)*, 549 F.3d 1211, 1216-18 (9th Cir. 2008).

Cascadia concedes the cumulative impact of past actions may be aggregated. It contends, however, that the BIA was not permitted to aggregate the Alder/Rasler

11

Project, because it is not a past action, but a reasonably foreseeable future action.[5]

*Castaneda* and *LOWD* did not reach that question. Both cases involved disputes regarding the aggregation of past projects. *See Castaneda*, 574 F.3d at 666 ("WildWest complains the cumulative impact statements do not contain discussion of prior projects on an individual basis."); *LOWD*, 549 F.3d at 1216 ("LOWD contends that the cumulative effects analysis . . . regarding past timber sales is insufficient because it 'only mentions one . . . past timber sale' . . . and otherwise generally 'states that timber harvest has occurred in the past.'" (second alteration in original)).

Agencies, however, have "discretion in deciding how to organize and present information" in environmental assessments. *See Mont. Wilderness Ass'n*, 725 F.3d at 1002. *LOWD* explained:

> [O]ur law . . . requires us to defer to an agency's determination in an area involving a high level of technical expertise . . . [and] we are not free to impose on the agency our own notion of which procedures are best or most likely to further some vague, undefined public good. . . . Accordingly, to the extent that 40 C.F.R. § 1508.7 does not explicitly provide otherwise, the Forest Service is free to consider cumulative effects in the aggregate or to use any other procedure it deems appropriate. It is not for this court to tell the Forest Service what *specific* evidence to include, nor how *specifically* to present it.

---

[5] The government concedes the Alder/Rasler Project is not a past action, but a reasonably foreseeable future action. Indeed, the Kokwel EA describes the Alder/Rasler Project as a "treatment[] proposed for the foreseeable future."

549 F.3d at 1218 (citations, alterations and internal quotation marks omitted).

That reasoning applies to projects that have been approved, following an independent environmental assessment under NEPA, just as it applies to projects that have been completed. Thus, 40 C.F.R. § 1508.7 does not explicitly require individual discussion of the impacts of reasonably foreseeable projects, and, absent such a requirement, it is not for the court to tell the agency how specifically to present such evidence in an EA.

Our role is to ensure that the agency takes a "hard look" at the cumulative environmental consequences of the proposed project, and provides a clear explanation of its analysis to enable informed public comment on the project and possible alternatives. *See Lands Council*, 395 F.3d at 1027. An agency can take a "hard look" at cumulative impacts either by individually discussing a previously approved project, or incorporating the expected impact of such a project into the environmental baseline against which the incremental impact of a proposed project is measured. Under either approach, what is important is that the agency make clear it has considered the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7.

Our holding that the aggregation of future projects can be permissible under NEPA does not require the public to "blindly" accept an agency's "conclusory

13

assertions," as Cascadia argues. We are mindful that one of the "twin aims" of NEPA is to "ensure[] that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983). When an agency chooses to aggregate reasonably foreseeable projects, it must be "clear from the record that the cumulative effects of the prior proposals were considered by both the drafting and approving agencies." *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 442 (5th Cir. 1981). Here, the Kokwel EA identified the Alder/Rasler Project as a reasonably foreseeable project that would be considered as part of the baseline, i.e., the "No Action Alternative." The expected impacts of the Alder/Rasler Project, in turn, were set forth in detail in the Alder/Rasler EA.

Our holding also is in accord with two circuits that have addressed this question. *See Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 70 (D.C. Cir. 1987) ("It makes sense to consider the 'incremental impact' of a project for possible cumulative effects by incorporating the effects of [previously approved] projects into the background 'data base' of the project at issue, rather than by restating the results of the prior studies."); *Piedmont Heights Civic Club*, 637 F.2d at 441 ("NEPA does not require an agency to restate all of the environmental

14

effects of other projects presently under consideration. Where the underlying data base includes approved projects and pending proposals, the 'statutory minima' of NEPA has been met." (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 548 (1978))). As the D.C. Circuit recognized in *Coalition for Sensible Transportation*, "incorporating the effects of other projects into the background 'data base' of the project at issue" can be "sufficient to alert interested members of the public to any arguable cumulative impacts involving these other projects." 826 F.2d at 70–71. Any further analysis "would be redundant and in no material way serve the purposes of NEPA." *Id.* at 71.

Cascadia argues that, even if it is permissible to aggregate previously approved projects into an environmental baseline, the Kokwel EA did not actually aggregate the impacts of the Alder/Rasler Project. We disagree. The Kokwel EA explained it measured the impacts of the Kokwel Project against a baseline that assumes "[o]ngoing activities would continue to occur on existing projects," including "other projects covered by earlier decision records." It is undisputed the Alder/Rasler Project was covered by an earlier decision record – the Alder/Rasler EA. The Kokwel EA later said, "[f]or the cumulative effects analysis the description of the potential resulting impacts is the cumulative effect of all past, present and reasonably foreseeable actions." It said "[r]easonably foreseeable

15

future actions are assumed to be the same for the No Action as well as the Proposed Action," and "Table 8 lists treatments proposed for the foreseeable future on [the Tribe's] lands in the analysis area that will be considered in the following resource-specific cumulative impact discussions." Table 8, in turn, lists only one project – the Alder/Rasler Project. Thus, the Kokwel EA explained the Alder/Rasler Project was a "treatment[] proposed for the foreseeable future," which was "assumed to be the same" for both the No Action and the Proposed Action, i.e., assumed as part of the baseline against which the incremental impact of the Kokwel Project was measured.

To be sure, when the EA set forth data regarding the incremental impact of the Kokwel Project on specific resources, it did not restate that the Alder/Rasler Project was incorporated into the baseline. With respect to the northern spotted owl, the EA provided a table showing the Kokwel Project would reduce habitat within the "home ranges" (1.3 miles) of four historic northern spotted owl sites from 2,985 to 2,718 acres. The EA did not specifically explain how it calculated the pre-harvest acreage of 2,985, or expressly say its calculation included the Alder/Rasler Project. Similarly, with respect to road construction, the EA said there were 543 miles of existing roads in the "Action Area," resulting in a road density of 4.73 mi/mi$^2$, and the Kokwel Project would create 2.92 miles of new

road, which would not measurably increase the road density. Again, the EA did not specifically explain how it calculated the pre-harvest mileage of roads, or expressly say its calculation included the Alder/Rasler Project.

Although the EA's explanation of its methodology could have been clearer, to repeat each time the EA presented baseline data for an individual resource that the Adler/Rasler Project was, in fact, considered would have been redundant and therefore unnecessary, particularly in a document meant to be "concise" and "[b]rief[]." *See* 40 C.F.R. § 1508.9(a). The EA is sufficiently clear that "the agency's path may reasonably be discerned." *Beno v. Shalala*, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal quotation marks omitted). By specifically identifying the Alder/Rasler Project at the outset and explaining it would be assumed as part of the baseline in the resource-specific cumulative impacts analyses, the Kokwel EA sufficiently "catalogu[ed] . . . relevant past projects in the area," *Lands Council*, 395 F.3d at 1027, told the public "what data the conclusion was based on," *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004), and "alert[ed] interested members of the public to any arguable cumulative impacts involving" the Alder/Rasler Project, *Coalition for Sensible Transp.*, 826 F.2d at 71. *See Castaneda*, 574 F.3d at 667 (holding EIS

17

adequately aggregated projects when it "refer[red] to a table of Current and Reasonably Foreseeable Actions, and state[d] past actions were considered in the Existing Conditions section").[6]  We therefore affirm the district court's grant of summary judgment to the defendants on the NEPA claim.[7]

## II.    Coquille Restoration Act

Cascadia argues the Kokwel Project violates the CRA because the project is inconsistent with the FWS Recovery Plan for the northern spotted owl.  The CRA requires the Secretary of Interior to manage the Coquille Forest "subject to the *standards* and *guidelines* of Federal forest plans on adjacent or nearby Federal lands, now and in the future."  25 U.S.C. § 715c(d)(5) (emphasis added).  Multiple federal forest plans cover the Coquille Forest.  One, the Coos Bay District Resource Management Plan (the Coos Bay Plan), "describes management of approximately 329,700 acres of land in Oregon," including the Coquille Forest.

---

[6] Cascadia's reliance on *Klamath-Siskiyou* is misplaced.  In *Klamath-Siskiyou*, we held an EA was inadequate when "it only consider[ed] the effects of the very project at issue," and offered only "generalized conclusory statements" regarding cumulative impacts.  387 F.3d at 996.  Here, as discussed above, the EA incorporated the Alder/Rasler Project into the baseline against which the cumulative impact of the Kokwel Project was measured, and set forth the baseline and post-harvest data on which its conclusions were based.

[7] Because the EA explained it aggregated the Alder/Rasler Project into the No Action Alternative, we reject Cascadia's argument this was a "post hoc rationalization" by the BIA.

18

The Coos Bay Plan lists as an "[o]bjective[]" to "[p]rotect, manage, and conserve federal listed . . . species and their habitats to achieve their recovery in compliance with the Endangered Species Act, approved recovery plans, and Bureau special status species policies." Cascadia argues the "objective" should be construed as a "standard and guideline" under the CRA, such that compliance with FWS recovery plans is mandatory in the Coquille Forest.[8] We reject that argument.

First, the Coos Bay Plan expressly establishes an "objective" of compliance with recovery plans, not a "standard" or "guideline." The Coos Bay Plan was adopted in 1995, a year before Congress amended the CRA to require compliance with applicable forest plan "standards and guidelines." Had Congress intended the CRA to require compliance with the "objectives" of the Coos Bay Plan, it could have done so expressly. *See Smith v. United States*, 508 U.S. 223, 229 (1993) ("Had Congress intended the . . . construction petitioner urges, it could have so indicated. It did not, and we decline to introduce that additional requirement on our own.").

---

[8] It is undisputed that, generally, FWS recovery plans are not mandatory. The Endangered Species Act does not mandate compliance with recovery plans for endangered species. *See Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 547-48 (11th Cir. 1996) (holding "recovery plans are for guidance purposes only").

Second, another federal forest plan covering the Coquille Forest, the Northwest Forest Plan (NFP), expressly establishes "Standards and Guidelines for Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl."[9] The NFP governs over 24 million acres of federal land in the Northwest, including the Coquille Forest. The NFP was adopted in 1994 largely in response to concern over the survival of the northern spotted owl. The NFP defines "standards and guidelines" as "[t]he rules and limits governing actions, and the principles specifying the environmental conditions or levels to be achieved and maintained." Congress is presumed to have been aware of the NFP when it adopted the CRA. *See Dir., OWCP v. Perini N. River Assocs.*, 459 U.S. 297, 319-20 (1983). That Congress required compliance with the "standards and guidelines" of applicable federal forest plans two years after the largest such plan specifically listed "standards and guidelines" suggests Congress did not intend to use the term in a "generic" way, as Cascadia contends. On the contrary, the more plausible inference is that Congress intended "standards and guidelines" to refer specifically to identified "standards and guidelines" in applicable federal forest plans.

---

[9] It is undisputed the NFP's standards and guidelines do not require compliance with the Recovery Plan for the Northern Spotted Owl.

20

Third, we reject Cascadia's argument that the Coos Bay Plan's "objectives" should be construed as "standards and guidelines" because the Coos Bay Plan uses similar language to describe its objectives as the NFP uses to define "standards and guidelines." The Coos Bay Plan's definition of "objectives" is substantially broader than the NFP's definition of "standards and guidelines." As noted, the NFP defines "standards and guidelines" as "[t]he rules and limits governing actions, and the principles specifying the environmental conditions or levels to be achieved and maintained." The Coos Bay Plan defines "objectives" as "[e]xpressions of what are the desired end results of management efforts." The NFP's "standards and guidelines" establish concrete requirements, such as "when an area is cut, 12 to 18 green trees per acre will be retained," and "[t]here must be 25 to 30 percent of each block in late-successional forest at any point in time." In contrast, the Coos Bay Plan's "objectives" establish general, high-level goals, such as "[m]anage for the conservation of state listed species and their habitats to assist the state in achieving management objectives," and "[s]tudy, maintain or restore community structure, species composition, and ecological processes of special status plant and animal habitat." Because we hold the CRA does not require compliance with the Coos Bay Plan's objective of compliance with recovery plans,

21

we affirm the district court's conclusion that the Kokwel Project did not violate the CRA.

**AFFIRMED.**

**Counsel**

Nicholas S. Cady (argued), Cascadia Wildlands, Eugene Oregon; Sean T. Malone, Eugene, Oregon; Daniel R. Kruse, Eugene, Oregon, for plaintiffs-appellants.

Sam Hirsch, Acting Assistant Attorney General, Department of Justice; Stuart Gillespie, Brian C. Toth and Ellen J. Durkee (argued), Environmental & Natural Resources Division, Department of Justice, Washington, D.C.; Mary Anne Kenworthy, Office of the Regional Solicitor, Department of the Interior, Portland, Oregon, for defendant-appellee.

Edmund C. Goodman (argued), Hobbs, Straus, Dean & Walker, LLP, Portland, Oregon; Brett V. Kenney, North Bend, Oregon, for intervenor-appellee.