**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MONTANA WILDERNESS
ASSOCIATION, a nonprofit
organization,
                    *Plaintiff-Appellant*,

            and

THE WILDERNESS SOCIETY; FRIENDS
OF THE MISSOURI BREAKS
MONUMENT; NATIONAL TRUST FOR
HISTORIC PRESERVATION; OIL AND
GAS ACCOUNTABILITY PROJECT,
                    *Plaintiffs*,

            v.

JAMIE CONNELL, in her official
capacity as Director of the Bureau of
Land Management's Montana State
Office; MIKE POOL, in his official
capacity as Acting Director of the
Bureau of Land Management;
BUREAU OF LAND MANAGEMENT, an
agency of the United States
Department of Interior; UNITED
STATES DEPARTMENT OF THE
INTERIOR, a federal department;
ZANE FULBRIGHT, in his official
capacity as Acting Manager of the

No. 11-35818

D.C. No.
4:09-cv-00095-
SEH

Upper Missouri River Breaks
National Monument,
             *Defendants-Appellees*,*

MISSOURI RIVER STEWARDS;
FERGUS COUNTY; PHILLIPS COUNTY;
CHOUTEAU COUNTY; BLAINE
COUNTY; RECREATIONAL AVIATION
FOUNDATION; MONTANA PILOTS
ASSOCIATION,
    *Intervenor-Defendants-Appellees*.

---

MONTANA WILDERNESS
ASSOCIATION, a nonprofit
organization,
             *Plaintiff*,

and

THE WILDERNESS SOCIETY; FRIENDS
OF THE MISSOURI BREAKS
MONUMENT; NATIONAL TRUST FOR
HISTORIC PRESERVATION; OIL AND
GAS ACCOUNTABILITY PROJECT,
             *Plaintiffs-Appellants*,

v.

JAMIE CONNELL, in her official
capacity as Director of the Bureau of
Land Management's Montana State
Office; MIKE POOL, in his official

No. 11-35821

D.C. No.
4:09-cv-00096-
SEH

OPINION

capacity as Acting Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT, an agency of the United States Department of Interior; UNITED STATES DEPARTMENT OF THE INTERIOR, a federal department; ZANE FULBRIGHT, in his official capacity as Acting Manager of the Upper Missouri River Breaks National Monument,
                    *Defendants-Appellees*,[*]

MISSOURI RIVER STEWARDS; FERGUS COUNTY; PHILLIPS COUNTY; CHOUTEAU COUNTY; BLAINE COUNTY; RECREATIONAL AVIATION FOUNDATION; MONTANA PILOTS ASSOCIATION,
      *Intervenor-Defendants-Appellees*.

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
February 5, 2013—Seattle, Washington

Filed July 31, 2013

---

[*] Pursuant to Fed. R. App. P. 43(c), Jamie Connell, Mike Pool and Zane Fulbright have been substituted for Gene Terland, Robert Abbey, and Gary Slagel.

Before: Raymond C. Fisher, Ronald M. Gould,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Fisher;
Partial Concurrence and Partial Dissent by Judge Gould

## SUMMARY[**]

### Bureau of Land Management

The panel affirmed in part and reversed in part the district court's summary judgment in this action brought by environmental groups challenging the Bureau of Land Management's Resource Management Plan for the Upper Missouri River Breaks National Monument.

The panel held that the Bureau of Land Management (BLM) complied with the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA) but violated the National Historic Preservation Act (NHPA). The panel vacated that portion of the judgment and remanded with instructions to enter judgment in favor of the plaintiffs on the NHPA claim and to enter an appropriate order requiring BLM to conduct Class III surveys with respect to roads, ways and airstrips that have not been subjected to recent Class III surveys.

Judge Gould concurred in the majority opinion's discussion of NEPA and the NHPA. He also joined, in part,

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

with the majority's discussion of the Resource Management Plan's compliance with the FLPMA and the Proclamation establishing the Monument. Judge Gould dissented from the majority's conclusion that the RMP's definition of "road" for purposes of the off-road travel ban was reasonable.

**COUNSEL**

Matthew K. Bishop (argued), Western Environmental Law Center, Helena, Montana, for Plaintiff-Appellant Montana Wilderness Association.

James S. Angell and Melanie R. Kay (argued), Earthjustice, Denver, Colorado, for Plaintiffs-Appellants The Wilderness Society, Friends of the Missouri Breaks Monument, National Trust for Historic Preservation and Oil and Gas Accountability Project.

Ignacia S. Moreno, Assistant Attorney General, Tyler Welti, Rachel K. Bowen, David C. Shilton, and Robert P. Stockman (argued), United States Department of Justice, Environment and Natural Resources Division, Washington, D.C.; Karan Dunnigan and Sarah Shattuck, Office of the Solicitor, United States Department of the Interior, for Defendants-Appellees Jamie Connell, in her official capacity as Director of BLM's Montana State Office; Mike Pool, in his official capacity as Acting Director of the Bureau of Land Management; Bureau of Land Management, an agency of the United States Department of the Interior; United States Department of the Interior, a federal department; Zane Fulbright, in his official capacity as Acting Manager of the Upper Missouri River Breaks National Monument.

Paul A. Turcke (argued), Moore Smith Buxton & Turcke, Chtd., Boise, Idaho, for Intervenor-Defendants-Appellees Recreational Aviation Foundation and Montana Pilots Association.

Steven J. Lechner (argued) and Jeffrey Wilson McCoy, Mountain States Legal Foundation, Lakewood, Colorado; Hertha L. Lund, Lund Law, PLLC, Bozeman, Montana, for Intervenor-Defendants-Appellees Missouri River Stewards, Fergus County, Phillips County, Chouteau County and Blaine County.

## OPINION

FISHER, Circuit Judge:

Plaintiff environmental groups challenge the Bureau of Land Management's (BLM) Resource Management Plan (RMP) for the Upper Missouri River Breaks National Monument (Monument). The district court granted summary judgment to the defendants on all claims. We affirm in part, reverse in part and remand. We hold that BLM complied with the Federal Land Policy and Management Act (FLPMA) and the National Environmental Policy Act (NEPA) but violated the National Historic Preservation Act (NHPA).

## BACKGROUND

The Antiquities Act authorizes the President of the United States to "declare by public proclamation historic landmarks, historic and prehistoric structures, and other objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States

to be national monuments." 16 U.S.C. § 431. In accordance with this authority, President Clinton issued a Proclamation establishing the Upper Missouri River Breaks National Monument in 2001. *See* Proclamation No. 7398, 66 Fed. Reg. 7359 (Jan. 17, 2001).

The Proclamation explains that:

> The Upper Missouri River Breaks National Monument contains a spectacular array of biological, geological, and historical objects of interest. From Fort Benton upstream into the Charles M. Russell National Wildlife Refuge, the monument spans 149 miles of the Upper Missouri River, the adjacent Breaks country, and portions of Arrow Creek, Antelope Creek, and the Judith River. The area has remained largely unchanged in the nearly 200 years since Meriwether Lewis and William Clark traveled through it on their epic journey. In 1976, the Congress designated the Missouri River segment and corridor in this area a National Wild and Scenic River (Public Law 94-486, 90 Stat. 2327). The monument also encompasses segments of the Lewis and Clark National Historic Trail, the Nez Perce National Historic Trail, and the Cow Creek Island Area of Critical Environmental Concern.

*Id.* at 7359. The Proclamation declares that the Monument, which comprises approximately 375,000 acres of federal land, boasts the most viable elk herd in Montana; one of the premier big horn sheep herds in the continental United States;

essential winter range for sage grouse; habitat for prairie dogs; one of the few remaining fully functioning cottonwood gallery forest ecosystems on the Northern Plains; large concentrations of antelope and mule deer; spawning habitat for the endangered pallid sturgeon; perching and nesting habitats for hawks, falcons and eagles; habitat for great blue heron, pelican and a wide variety of waterfowl; habitat for 48 fish species; archeological and historical sites, from teepee rings and remnants of historic trails to abandoned homesteads and lookout sites used by Meriwether Lewis; and remnants of a rich Native American and pioneer history scattered throughout the Monument. *See id.* at 7359–60.

The President established the Monument for the express purpose of protecting the aforementioned objects. *See id.* at 7361. To achieve that protection, the President directed the Secretary of Interior to develop a transportation plan limiting roads and prohibiting off-road travel:

> The Secretary of the Interior shall prepare a transportation plan that addresses the actions, including road closures or travel restrictions, necessary to protect the objects identified in this proclamation.
>
> For the purpose of protecting the objects identified above, the Secretary shall prohibit all motorized and mechanized vehicle use off road, except for emergency or authorized administrative purposes.

*Id.*

Consistent with those mandates, BLM began working on a resource management plan (RMP), including a transportation plan, for the Monument in 2002. As part of the process, and to comply with NEPA, BLM prepared draft and final environmental impact statements (FEIS). In 2008, BLM adopted the RMP. The RMP continues to authorize roads, airstrips and motorboats in the Monument, but at reduced levels. The RMP closes 201 miles of roads and ways year-round, closes another 111 miles seasonally and leaves 293 miles open year-round; prohibits off-road vehicle use; closes four airstrips year-round, closes one seasonally and leaves five open year-round; and restricts motorized watercraft use to particular days of the week in wild and scenic segments (and seasonally in the wild segment) of the Upper Missouri National Wild and Scenic River.

The plaintiffs filed two lawsuits challenging the RMP, one brought by the Montana Wilderness Association (MWA) and a second brought by The Wilderness Society, Friends of the Missouri Breaks Monument, the National Trust for Historic Preservation and the Oil and Gas Accountability Project (collectively, TWS). The plaintiffs asserted violations of FLPMA, NEPA and the NHPA. The district court granted summary judgment to the defendants and denied summary judgment to the plaintiffs. The plaintiffs timely appealed.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. We review de novo the district court's grant or denial of summary judgment. *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 598 (9th Cir. 2010). The plaintiffs' claims under FLPMA, NEPA and the NHPA are reviewed under the Administrative Procedure Act (APA).

*See id.* Under the APA, an agency decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We will sustain BLM's interpretation of the Proclamation so long as it is reasonable. *Cf. Kester v. Campbell*, 652 F.2d 13, 15–16 (9th Cir. 1981) ("In light of an agency's presumed expertise in interpreting executive orders charged to its administration, we review such agency interpretations with great deference. . . .   All that is required is that the interpretation adopted by the agency be reasonable.").

## DISCUSSION

## I.  FLPMA

### A.  Wilderness Study Areas[1]

FLPMA provides that the Secretary of Interior "shall review those roadless areas of five thousand acres or more and roadless islands of the public lands, identified during the inventory required by section 1711(a) of this title as having wilderness characteristics described in the Wilderness Act of September 3, 1964 (78 Stat. 890; 16 U.S.C. 1131 et seq.) and shall from time to time report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness." 43 U.S.C. § 1782(a).  "During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as

---

[1] Monument lands include six wilderness study areas.  The Secretary of Interior established these areas in 1979 and 1980.

wilderness . . . ."  *Id.* § 1782(c).  Thus, as relevant here, FLPMA imposes two requirements on wilderness study areas (WSAs): first, they must be roadless; second, they must be managed so as not to impair their suitability for preservation as wilderness until Congress either designates them as wilderness or releases them for other purposes.  MWA contends that the Monument RMP violates each of these mandates.

## 1.  Roadlessness

FLPMA does not define the term roadless, but the House Report on the legislation provides a definition that the parties agree is authoritative.  Under this definition, "[t]he word 'roadless' refers to the absence of roads which have been *improved and maintained by mechanical means* to insure relatively regular and continuous use.  A way maintained *solely by the passage of vehicles* does not constitute a road." H.R. Rep. No. 94-1163, at 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6175, 6191 (emphasis added).  Here, the RMP designates 23.8 miles of ways within the Monument's six WSAs as open.  MWA argues that these are really roads, rather than ways, and that the RMP therefore violates FLPMA's requirement that WSAs be roadless.

MWA is correct that, on its face, the RMP appears to assign all two-track routes within the Monument, including ways within WSAs, to Maintenance Level 2.  MWA is also correct that Maintenance Level 2 entails maintenance by mechanical means – e.g., installation and maintenance of drainage structures or use of suitable materials such as rock or gravel to control runoff, sedimentation and rutting; grading as necessary to correct drainage problems and erosion; brushing or tree removal to allow administrative access; and

sinkhole repair to address safety hazards. We presume that these types of maintenance would convert ways into roads, violating FLPMA's requirement that WSAs be roadless.**[2]**

Elsewhere, however, the RMP indicates that these types of maintenance do not apply to two-track routes *located within WSAs*. The RMP states that the Monument's WSAs will continue to be managed under the BLM's Interim Management Policy for Lands Under Wilderness Review (IMP). The IMP, in turn, recognizes that WSAs are roadless areas, that roadlessness refers to the absence of routes that have been improved and maintained by mechanical means, that roadlessness must be maintained throughout the wilderness study period and that ways within WSAs are to be maintained "solely by the passage of vehicles." Thus, although one section of the RMP appears to assign two-track routes within WSAs to Level 2 maintenance, the section of the RMP devoted specifically to WSAs directs that these routes will be maintained as before, solely by the passage of vehicles.

The government argues, and we agree, that the RMP's "specific directive that 'vehicle ways' will be maintained under the non-impairment standard of the IMP trumps the general rule that two-track routes/roads will be subject to level 2 maintenance." Answering Br. of Federal Defendants-

---

**[2]** BLM's Interim Management Policy for Lands Under Wilderness Review defines "improved and maintained" as "[a]ctions taken physically by man to keep the road open to vehicular traffic"; it defines "mechanical means" as "[u]se of hand or power machinery or tools."

Appellees, No. 11-35818, at 36.[3]  Because the government's reading of the RMP is reasonable, we conclude that the RMP does not authorize ways in WSAs to be maintained by mechanical means.  We therefore reject MWA's argument that the RMP violates FLPMA's  requirement that WSAs remain roadless.

## 2.  Nonimpairment

As noted, WSAs must be managed "so as not to impair the[ir] suitability . . . for preservation as wilderness." 43 U.S.C. § 1782(c).  BLM has implemented this nonimpairment mandate through the IMP.[4]  The IMP prohibits uses, facilities or activities in WSAs unless they are temporary and do not create surface disturbance or involve the permanent placement of facilities.  Surface disturbance is "any new disruption of the soil or vegetation requiring reclamation (i.e., recontouring of the topography, replacement of topsoil, and/or restoration of native plant cover)."  In applying these standards, "preservation of wilderness values" – including roadlessness, naturalness, solitude and opportunities for primitive and unconfined recreation – is the "paramount" and "overriding consideration."

---

[3] Should this turn out not to be the case, we assume that MWA could at that time bring an appropriate action to challenge BLM's actions.

[4] The parties agree that meeting the standards outlined in the IMP ensures compliance with FLPMA's nonimpairment mandate.  *See* Montana Wilderness Association's Reply Br. 2; Answering Br. of Federal Defendants-Appellees, No. 11-35818, at 30.  We therefore assume for purposes of this appeal that the IMP constitutes a reasonable and authoritative interpretation and implementation of FLPMA, 43 U.S.C. § 1782(c).  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

Consistent with these general standards, the IMP defines a way as "a trace maintained solely by the passage of vehicles which has not been improved and/or maintained by mechanical means to ensure relatively regular and continuous use," and provides that ways "may be used and maintained as before, as long as this does not cause new impacts that would impair the area's wilderness suitability."

The IMP also imposes procedural requirements on BLM. It states that "BLM will review all proposals for uses and/or facilities within WSAs to determine whether the proposal meets the [nonimpairment] criteria . . . . Uses and/or facilities found to be nonimpairing *may* be permitted on lands under wilderness review.   Uses and/or facilities found to be impairing will be denied."

In developing the RMP here, BLM began by conducting an inventory of the Monument, including the WSAs, to map existing roads and ways. This inventory identified 51.1 miles of preexisting vehicle ways within the Monument's six WSAs. BLM then adopted the RMP, closing some roads and ways and designating others as open. Within the WSAs, the RMP closes 27.3 miles of vehicle ways and designates 23.8 miles as open – 14.6 miles seasonally and 9.2 miles year-round.

MWA argues that BLM's decision to designate these ways as open violates the nonimpairment mandate:

> BLM's decision to designate system roads in the WSAs results in new surface disturbance and on-the-ground changes that will degrade the areas' wilderness values pending a final decision from Congress.  If the 24 miles of

> ways were left alone and remained "ways,"
> they would not be open for motorized use in
> the Monument, they would not be included on
> the road system map, and no improvements or
> maintenance would be allowed. They would
> remain largely unnoticeable on the landscape
> and left to revegetate naturally. But now that
> the 24 miles of ways are system roads, they
> are open to motorized use, depicted on
> Monument maps, and subjected to BLM's
> minimum road maintenance requirements.

Montana Wilderness Association's Opening Br. 23 (record citations omitted).[5] In MWA's view, "the new roads will . . . be subjected to increased use, now that they are depicted on the Monument's transportation map and open to the public for motorized travel." *Id.* at 24.

MWA is correct that increased use has the potential to degrade wilderness values, and thus to violate the nonimpairment mandate. The FEIS recognizes that increased "vehicular travel on roads could increase disturbances to soils; resulting in increased soil compaction, rutting, surface runoff and subsequent erosion." We also accept, in principle, MWA's contention that designating ways as open and depicting them on BLM maps *can* fundamentally transform them from little-known and little-used two-tracks to heavily

---

[5] We have already concluded that the RMP does not subject ways in WSAs to Level 2 maintenance. We therefore necessarily also reject MWA's argument that subjecting these ways to Level 2 maintenance will degrade wilderness values and violate the nonimpairment mandate. We instead focus on MWA's argument that the RMP violates the nonimpairment mandate by designating these ways as open and by depicting them on Monument maps.

trafficked thoroughfares. And we accept the proposition that, when such a transformation takes place, it may well degrade wilderness values, not only by producing new surface disturbances on and adjacent to the routes themselves, but also by interfering with wildlife, naturalness, solitude and opportunities for primitive and unconfined recreation.

In this case, however, the record does not support MWA's assertions that BLM's actions will fundamentally transform these ways by significantly increasing use. The record therefore does not support the conclusion that the RMP will degrade wilderness values and violate the nonimpairment mandate. We reach this conclusion because the government has presented evidence, included in the record, that these ways were designated as open and mapped *before* the Monument RMP. Prior to the Monument RMP, the lands within the Monument were covered by two other resource management plans, the Judith Valley Phillips RMP (1992) and the West HiLine RMP (1988). Like the RMP at issue here, each of these earlier RMPs "designated" ways as open and depicted them on BLM maps. The West HiLine RMP, for example, states that "[t]ravel in WSAs would be limited to existing roads and vehicular ways" and that "BLM would publish maps showing designated areas and applicable restrictions." It required BLM to "[i]nventory roads, trails, and ways" in WSAs and to "publish [a] map of road restrictions for each area."

In the absence of evidence in the record that the RMP's designation and mapping of these ways is fundamentally different from existing designation and mapping, we cannot say that BLM's actions degrade wilderness values. We therefore reject MWA's argument that the RMP violates FLPMA's nonimpairment mandate. That being said, we

recognize the possibility that a variety of factors – mapping, increased visitorship, more concentrated use brought about by the closure of more than half of the ways in WSAs – could increase use and degrade wilderness values.[6] Under the IMP, BLM is under an ongoing obligation to monitor this use and its impact on wilderness values and to take corrective action if the evolving use of existing ways "cause[s] new impacts that would impair the area's wilderness suitability." As the RMP recognizes, "[t]he road system could be modified if vehicle use traffic patterns or resource conditions change."[7]

## B.  Off-Road Travel

The Proclamation prohibits "all motorized and mechanized vehicle use off road, except for emergency or authorized administrative purposes." 66 Fed. Reg. at 7361. MWA and TWS contend that the RMP violates this mandate by authorizing travel on vehicle ways that do not meet any reasonable definition of road. MWA also argues that the RMP violates the mandate by authorizing travel within 50

---

[6] By pointing out that route closures can increase use on routes that remain open, we do not suggest that route closures impair wilderness values. As a general matter, we presume that route closures have the overall effect of *enhancing* wilderness values.

[7] Because MWA has not shown that the ways authorized by the RMP are new uses or facilities, we also reject MWA's argument that BLM violated the IMP's procedural requirement that BLM review all proposals for uses or facilities within WSAs to determine whether a proposal meets the nonimpairment criteria.

feet of roads (except in WSAs) for parking and camping. We address these arguments in turn.[8]

### 1. Definition of Road

For purposes of the off-road travel ban, the RMP defines roads to include not only constructed and improved routes but also two-track routes (ways) created and maintained solely by the passage of vehicles. It provides:

> *Motorized travel is not considered cross-country (off road) on BLM land when*:
>
> - The motorized vehicle travels on constructed roads that are maintained by the BLM. Constructed roads are often characterized with cut and fill slopes.
>
> - *Motorized vehicle use [takes place on] clearly evident, two-track routes with regular travel and continuous passage of motorized vehicles over a period of years.* A two-track is where perennial vegetation

---

[8] BLM's compliance with the Proclamation is subject to judicial review under FLPMA, which provides that the Secretary of Interior "shall manage the public lands under principles of multiple use and sustained yield . . . , except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law." 43 U.S.C. § 1732(a). Because this provision incorporates the Proclamation's terms into FLPMA, we need not consider whether the Proclamation itself is subject to judicial review. *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997) (determining whether executive orders were subject to judicial review).

is devoid or scarce, or where wheel tracks are continuous depressions in the soil yet evident to the casual observer and are vegetated.

(Emphasis added.)

The plaintiffs argue that this definition of road is unreasonable because it departs from two national definitions of road that existed at the time President Clinton issued the Proclamation in 2001: FLPMA's roadless definition (1976) and the BLM 9100 Engineering Manual (1991).

The plaintiffs are correct that the RMP's definition of road is a departure from these other definitions. For purposes of wilderness designation, FLPMA limits roads to routes that have been "improved and maintained by mechanical means"; ways, maintained "solely by the passage of vehicles," are excluded from FLPMA's definition of road, as explained earlier. H.R. Rep. No. 94-1163, at 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6175, 6191. Similarly, the 1991 Engineering Manual defines a road as a route "maintained for regular and continuous use" and a way as a route that "receives no maintenance to guarantee regular and continuous use." The definition of road adopted by the RMP to carry out the Proclamation's off-road travel ban – defining roads to include two-tracks maintained solely by the passage of vehicles – indisputably departs from these definitions. We nonetheless uphold BLM's definition.

First, the Proclamation does not define the terms "road" or "off road." BLM therefore has discretion to adopt reasonable definitions of these terms. *See Kester*, 652 F.2d at 15 (holding that we review agency interpretations of

executive orders with "great deference"). Second, it is not self-evident that FLPMA's roadless definition should apply to the Proclamation's off-road travel ban. FLPMA's definition arises in a specific context – identifying roadless areas for purposes of ascertaining their suitability for designation as wilderness. There is no reason to assume that FLPMA's definition applies for all purposes beyond that context – or specifically to off-road travel policies. Third, the RMP's implementation of the Proclamation's off-road travel ban is not unreasonable on its face. Consistent with the evident intent of the Proclamation, the RMP plainly restricts motorized use to *designated* routes, thus prohibiting off-road travel in the ordinary sense of the term.

Finally, although the RMP's definition is contrary to the FLPMA and Engineering Manual definitions discussed above, it is also consistent with several seemingly relevant definitions of road that either existed or were in development at the time the Proclamation was issued:

• *Judith Valley Phillips RMP (1992) and West HiLine RMP (1988).* At the time of the Proclamation, the lands that now make up the Monument were covered by the Judith Valley Phillips and West HiLine resource management plans. Consistent with the Monument RMP, these plans defined a road to include "[a] two-track route established from use of four-wheeled vehicles over a period of time."

• *Off-road Policy Governing BLM Lands in Montana (2003).* In June 2003, BLM adopted an off-road vehicle (OHV) policy for Montana and the Dakotas. Consistent with the Monument RMP, the OHV policy defines off-road travel to exclude motorized vehicle use on "clearly evident two-track and single-track routes with regular use and

continuous passage of motorized vehicles over a period of years." Although BLM adopted this policy in 2003, two years after President Clinton issued the Proclamation, BLM issued a draft EIS in 1999, more than a year before the Proclamation. *See* Notice of Availability of the Draft Off-Highway Vehicle Environmental Impact Statement and Plan Amendment, 64 Fed. Reg. 61,932 (Nov. 15, 1999).

• *BLM H-9113 Guidelines for Inventorying Roads (1985).* In 2001, when President Clinton issued the Proclamation, BLM's guidelines for inventorying roads included two-track routes and primitive roads (ways) maintained solely by the passage of vehicles.

For these reasons, we cannot say that BLM abused its discretion by defining roads to include vehicle ways for purposes of the Proclamation's off-road travel ban. BLM's implementation of the off-road travel ban therefore does not violate FLPMA.[9]

---

[9] We also reject TWS's alternative arguments that the RMP's definition of road constitutes an unexplained change of course, that BLM relied on irrelevant factors when choosing the definition and that BLM failed to adequately explain its reasons for adopting this definition. We agree with our dissenting colleague that BLM could have offered a more complete explanation, but we conclude that the explanation was adequate under the circumstances. *See Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir. 2010) (per curiam) ("[W]hile an agency should provide a reasoned basis for its actions, we 'will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.'" (citation omitted) (quoting *McFarland v. Kempthorne*, 545 F.3d 1106, 1113 (9th Cir. 2008))).

### 2.  Parking within 500 Feet of Roads

The RMP allows parking and dispersed camping within 50 feet of roads and ways within the Monument, other than in WSAs.  It provides:

> Outside of the WSAs, motorized or mechanized vehicles may park adjacent to a road to provide a reasonable safe distance for the public to pass.  However, parking must be within 50 feet of a road.  Parking will be encouraged at previously used sites.

> In the WSAs, motorized or mechanized vehicles may only park immediately adjacent to a vehicle way or cherry stem road.

MWA contends that this rule violates the Proclamation's off-road travel ban by allowing travel off-road.  MWA further argues that the rule cannot be justified by the Proclamation's "administrative purposes" exception because parking within 50 feet of roads and ways is not "necessary for members of the public to safely turn around."  Montana Wilderness Association's Opening Br. 27.

The government's arguments to the contrary notwithstanding, we agree with MWA that the 50-foot parking rule authorizes off-road travel.  *See* Record of Decision, Off-Highway Vehicle Environmental Impact Statement and Proposed Plan Amendment for Montana, North Dakota and South Dakota 5 (2003) (treating camping within 300 feet of roads and trails as a form of "cross-country travel").  We agree with the government, however, that the RMP's parking rule constitutes a permissible interpretation of

the Proclamation's "administrative purposes" exception. BLM concluded that the parking rule provides a reasonable safe distance for the public to pass a parked vehicle. The Proclamation does not define "administrative purposes," and BLM's interpretation of the term, although broad, is not unreasonable. BLM's conclusion that the rule advances the interests of safety is also reasonable. The dispersed camping rule therefore does not violate the Proclamation's off-road travel ban.

## C.  Bullwhacker Area

The Antiquities Act authorizes the President "to declare by public proclamation historic landmarks, historic and prehistoric structures, and other *objects* of historic or scientific interest that are situated upon the lands owned or controlled by the Government of the United States to be national monuments, and may reserve as a part thereof parcels of land, the limits of which in all cases shall be confined to the smallest area compatible with the proper care and management of the *objects* to be protected."  16 U.S.C. § 431 (emphasis added).

Here, the Proclamation declares that "[t]he Upper Missouri River Breaks National Monument contains a spectacular array of biological, geological, and historical objects of interest."  66 Fed. Reg. at 7359.  The Proclamation proceeds to describe these objects, including in a paragraph referring to the Bullwhacker area:

> The Bullwacker area of the monument contains some of the wildest country on all the Great Plains, as well as important wildlife habitat.  During the stress-inducing winter

> months, mule deer and elk move up to the
> area from the river, and antelope and sage
> grouse move down to the area from the
> benchlands. The heads of the coulees and
> breaks also contain archeological and
> historical sites, from teepee rings and
> remnants of historic trails to abandoned
> homesteads and lookout sites used by
> Meriwether Lewis.

*Id.* at 7360. BLM concluded that the Bullwhacker area was not an "object" of the Monument, although objects within the Bullwhacker area were to be protected.

MWA argues that BLM was required to protect the Bullwhacker area as an object of the Monument. The Proclamation, however, is ambiguous as to whether the President intended to make the Bullwhacker area itself, as opposed to the wildlife habitat and archeological and historic sites within the Bullwhacker area, an object of the Monument. BLM's interpretation is therefore entitled to deference, *see Kester*, 652 F.2d at 15, and we conclude that its interpretation is reasonable.

MWA appears to argue in the alternative that, even if the Bullwhacker area itself is not an object of the Monument, the RMP fails to protect Monument objects within the Bullwhacker area. Specifically, MWA complains that the RMP permits three airstrips in the Bullwhacker area, arguing that these airstrips are inconsistent with the Proclamation. MWA relies on a letter written by a BLM official in 2002:

> At this time, we are not interested in officially
> re-establishing these airstrips, nor establishing

> new airstrips within the monument. We are
> currently managing the monument under the
> Presidential Proclamation and the June 2001
> State Director's Interim Guidance for
> managing the . . . Monument . . . . Though
> these documents are silent on airstrips within
> the monument, we don't feel they would be in
> conformance with either.

MWA's argument that this letter bound BLM is unpersuasive. In the very next sentence the letter said, "We are, however, about to begin scoping the issues for a resource management plan (RMP) for the monument, and we will consider addressing the need for these airstrips in the RMP."

MWA also complains that the RMP increases airstrips and roads within the Bullwhacker area when compared to a 1979 inventory of the area. The 1979 inventory showed only 12 miles of roads, whereas the RMP authorizes approximately 46 miles of system roads in the area. MWA, however, does not explain why 1979 should be used as a baseline for assessing compliance with the Proclamation. If the baseline is 2001, when the Proclamation was issued, then the RMP *reduces* the number of roads within the Bullwhacker area (and the Monument generally). The operative question, moreover, is not how many roads are authorized, but rather whether Monument objects are protected. MWA has not shown that BLM failed to consider or adequately protect Monument objects within the Bullwhacker area.

## II. NEPA

### A. Cumulative Impacts

"For 'major federal actions significantly affecting the quality of the human environment,' 42 U.S.C. § 4332(2)(C), the agency is required to prepare an environmental impact statement ('EIS')." *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004). "An EIS is a thorough analysis of the potential environmental impacts that 'provide[s] full and fair discussion of significant environmental impacts and . . . inform[s] decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.'" *Id.* (alterations in original) (quoting 40 C.F.R. § 1502.1). An EIS must also consider cumulative impacts:

> Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

Here, MWA argues that BLM failed to take a hard look at cumulative effects by neglecting to analyze how a host of activities authorized by the RMP (including six airstrips, over

400 miles of roads and jet boats), in conjunction with grandparented activities already occurring in the Monument (especially oil and gas development and livestock grazing), may cumulatively impact objects of the Monument, including (1) the "most viable" elk herd in Montana; (2) one of the "premier" big horn sheep herds in the continental United States; and (3) the Upper Missouri National Wild and Scenic River (UMNWSR).

At the most basic level, MWA faults the FEIS because it does not include sections devoted exclusively to cumulative impacts on elk, bighorn sheep and opportunities for solitude in the UMNWSR. MWA properly points out that a NEPA analysis should be informed by the laws driving the federal action being reviewed. *See Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1109 (9th Cir. 2010) ("[B]ecause 'NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action,' the considerations made relevant by the substantive statute driving the proposed action must be addressed in NEPA analysis." (citation omitted) (quoting *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553 (1978))). The Proclamation and the Antiquities Act focus on the protection of "objects," so MWA suggests that the FEIS should have included sections – including cumulative impact analyses – devoted to each of the Monument's objects.

An agency, however, has discretion in deciding how to organize and present information in an EIS. *See League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008) (holding that an agency "is free to consider cumulative effects in the aggregate or to use any other procedure it deems

appropriate. It is not for this court to tell the [agency] what *specific* evidence to include, nor how *specifically* to present it."). Here, BLM structured the FEIS around specific subjects – air quality; cultural resources; fish and wildlife; geology and paleontology; soils; vegetation; visual resources; water; forest resources; lands and realty; livestock grazing; oil and gas; recreation; transportation; fire management; wilderness study areas; social conditions; and economic conditions – rather than around the objects of the Monument. Although the FEIS does not include sections devoted exclusively to elk, bighorn sheep, the UMNWSR and other objects of the Monument, the FEIS discusses these objects throughout. Bighorn sheep, for example, are discussed not only in the section addressing impacts on fish and wildlife, but also in the sections on livestock grazing, oil and gas, transportation, social conditions and economic conditions. BLM's decision to structure the FEIS in this fashion was within the agency's discretion.

Whether BLM complied with NEPA thus turns on the *substance* of the FEIS rather than its form: the question boils down to whether BLM took a hard look at impacts on the UMNWSR, elk and bighorn sheep. We conclude that BLM did so.

### 1. UMNWSR

In 1976, Congress added a 149-mile segment of the Missouri River to the National Wild and Scenic River System. BLM has long managed the river to support a range of recreational experiences, from motorized use to more primitive forms of recreation that afford visitors opportunities for solitude, and the RMP continues to manage the river corridor with this balance in mind. As the FEIS explains,

"[b]oating the Missouri River just for the sake of being on the water occurs, but the beauty and the solitude along the route are highly important to many visitors." In addition to discussing opportunities for motorized recreation, the FEIS describes the river valley's "unique beauty and abundant wildlife" and identifies its "pristine scenery and opportunities for solitude and recreation in an unconfined setting [as] extremely important values."

MWA argues that BLM failed to consider cumulative impacts on these values, especially opportunities for solitude:

> From river mile 104 to river mile 128, for instance, BLM authorizes an airstrip, motorized use on eight roads, dispersed vehicle camping, motorboats, and a level 2 developed boat camp. In addition, preexisting oil and gas development, livestock grazing (fencing, water developments) and utility rights-of-way corridors are also occurring within or on land adjacent to this wild segment of the River.

Montana Wilderness Association's Opening Br. 35. MWA acknowledges that the FEIS considers the impacts of each of these uses individually but faults BLM for failing to consider their *cumulative* impact.

MWA is correct that the FEIS does not include a section devoted exclusively to cumulative impacts on the river (or to cumulative impacts on opportunities for solitude within the river corridor). The FEIS, however, plainly takes a hard look at these impacts. The FEIS discusses visual quality in the river; the sight, sound and smell effects of motorized boats on

primitive river experiences; the effects of campsites and signs on the primitive nature of the river; the effects of ranches and power lines visible from the river; the noise and disturbance effects of personal watercraft; the noise and intrusion of floatplanes on the natural and primitive setting of the river; BLM's decision to limit commercial use permits to control the volume of use on the river and adjacent campsites; BLM's decision to impose a two-night camping limit to alleviate sight and sound impacts during the busy season; BLM's decision to impose Leave No Trace camping rules in primitive settings; BLM's decision to limit signage to protect visual quality and the primitive setting; BLM's decision to prohibit personal watercraft and floatplanes on 146 miles of the 149-mile river segment falling within the Monument; BLM's decision to limit motorized watercraft to certain speeds, directions, days of the week and seasons; the noise and visual impacts of motorcraft used for administrative purposes; the effects of natural gas wells on visitors seeking a primitive setting; the effect of closing 49 percent of roads within the area on walk-in opportunities for visitors; the effects of the dispersed camping rule and signage; the effect of authorizing six airstrips on opportunities for a primitive experience; the potential impact of future development (e.g., of campsites) along the river; BLM's decision to designate 76 percent of the river to the most restrictive visual management category (VRM Class I); and the effects of roads and airstrips on primitive experiences.

Thus, notwithstanding the absence of a cumulative impact section devoted specifically to opportunities for solitude along the river, the FEIS certainly considers the effects of roads, airstrips, planes, motorized watercraft, signs, camping and development on opportunities for solitude and the primitive recreational experience.  The impacts of the

proposed RMP on opportunities for solitude in the river corridor, therefore, are "set forth in sufficient detail to promote an informed assessment of environmental considerations and policy choices by the public and agency personnel upon review of the Final Environmental Impact Statement." *Lands Council v. Powell*, 395 F.3d 1019, 1028 (9th Cir. 2005).

## 2.  Elk and Bighorn Sheep

MWA also faults BLM for failing to provide a cumulative impacts analysis on elk habitat.  It complains that the RMP authorizes five airstrips, hundreds of miles of roads, utility rights-of-way, jet boats, developed recreational sites, livestock grazing and oil and gas development within the elk winter range, but the FEIS does not consider the combined impact of these actions on the local elk herd.  Once again, MWA is technically correct: the FEIS contains no section devoted *exclusively* to the cumulative impact of these uses on elk.

The FEIS, however, considers the impact of roads, planes, motorcraft, fences, developed campsites and oil and gas development on wildlife generally, and these analyses focus extensively on elk.  The FEIS discusses the effect of road closures on elk habitat; elk habitat and history; impacts of water development on elk; the effect of fire management on elk; the positive impacts on elk winter habitat of limiting surface-disturbing or disruptive activities in winter; the effect of fences on elk and other wildlife; benefits to elk from new water developments resulting in additional distribution of water sources and wetland habitat; seasonal restrictions on right-of-way construction to protect winter habitat for big game species; the significance of requiring right-of-way

corridors to restore habitat to native vegetation after construction; the possibility of limiting horn hunting to protect big game from excessive disturbance; the effect of developed recreational sites on big game; the impact of oil and gas drilling on wildlife, including elk, and restrictions adopted to minimize the impact; the effect of roads on big game wildlife; and the effect of airstrips on wildlife. The FEIS, moreover, includes a cumulative impacts analysis for fish and wildlife, and this analysis includes a specific subsection devoted to big game, including elk. Thus, even though the FEIS does not offer a cumulative effects analysis *specific to elk*, BLM adequately considered cumulative impacts on the Monument's elk population.

For similar reasons, we hold that BLM adequately considered impacts on bighorn sheep.

## B.  Reasonable Range of Alternatives

Environmental impact statements "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. To this end, an EIS shall "[r]igorously explore and objectively evaluate all reasonable alternatives," so as to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Morongo Band of Mission Indians v.*

*FAA*, 161 F.3d 569, 575 (9th Cir. 1998)) (internal quotation marks omitted).

Here, BLM considered six airstrip alternatives. Two alternatives would have opened 10 airstrips, one would have opened seven airstrips, one would have opened six airstrips, one would have opened five airstrips year-round and a sixth seasonally and one would have opened no airstrips. No alternatives considered opening between zero and six airstrips. On this record, TWS argues that BLM failed to consider a reasonable range of airstrip alternatives. In TWS's view, "BLM's failure to consider a 'middle ground' airstrip alternative that would have opened less than a majority of the airstrips was unreasonable." Appellants' Opening Br., No. 11-35821, at 57.

We disagree. Although BLM could have included an alternative that opened more than zero but less than six alternatives, NEPA did not compel the agency to do so. First, BLM did consider a mid-range alternative – one that opened five of the 10 airstrips year-round and a sixth airstrip seasonally. Second, the touchstone of the NEPA inquiry is "whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist.*, 376 F.3d at 868 (internal quotation marks omitted). Although TWS faults BLM for failing to consider an additional mid-range alternative, it does not explain why another alternative was necessary to foster informed decisionmaking and public participation.

TWS's reliance on *California v. Block*, 690 F.2d 753 (9th Cir. 1982), is misplaced. *Block* involved the Forest Service's classification of roadless areas into three planning categories:

Wilderness, Further Planning and Nonwilderness. The FEIS seriously considered eight alternatives, but none of those alternatives designated more than 33 percent of the roadless acreage to undeveloped Wilderness. *See id.* at 765. The court held that this range of alternative was unreasonable because, although the FEIS "pose[d] the question whether development should occur at all, it uncritically assume[d] that a substantial portion of the [roadless] areas should be developed and consider[ed] only those alternatives with that end result." *Id.* at 767. Here, by contrast, BLM considered not only alternatives that would have authorized at least six airstrips but also an alternative that would have authorized no airstrips at all.

## III.  NHPA

### A.  Reasonable Identification Efforts

Section 106 of the National Historic Preservation Act (NHPA) "requires that, prior to any federal undertaking, the relevant federal agency 'take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]' and 'afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.'" *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999) (per curiam) (second alteration in original) (quoting 16 U.S.C. § 470f). "Section 106 of NHPA is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs." *Id.* "Under NHPA, a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing

on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5, 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5(c), 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e), 800.9(c)." *Id.*

NHPA regulations provide that an agency "shall make a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation, oral history interviews, sample field investigation, and field survey."  36 C.F.R. § 800.4(b)(1). The BLM Manual sets out three types of surveys that may be used to identify historic and cultural resources. *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 601 n.10 (9th Cir. 2010); BLM Manual 8110 (Release 8-73, Dec. 3, 2004), *available at* http://www.blm.gov/pgdata/etc/medialib/blm/wo/ Information_Resources_Management/policy/blm_manual. Par.23101.File.dat/8110.pdf (last visited July 13, 2013).

- A Class I survey is "a professionally prepared study that includes a compilation and analysis of all reasonably available cultural resource data and literature, and a management-focused, interpretative, narrative overview, and synthesis of the data."  BLM Manual 8110.2.21.A.1.  This alternative relies on existing information rather than entailing additional, on-the-ground surveying.  The BLM Manual states that "[a] class I inventory is most useful for gaining a comprehensive view of all the known archaeological, historic, cultural and traditional places within a large area, such as the area to be covered by a land-use plan or an EIS."  *Id.*

- A Class II survey is a "probabilistic field survey" or "statistically based sample survey" that "aid[s] in characterizing the probable density, diversity, and distribution of cultural properties in an area." BLM Manual 8110.2.21.B.1. This alternative involves on-the-ground surveying, but it relies on sampling rather than evaluating every square foot of an area. The BLM Manual provides that "[a] class II survey is most useful for improving cultural resource information in a large area, such as for planning or EIS purposes, where insufficient systematic identification work has been done in the past." *Id.*

- A Class III survey is an "[i]ntensive" survey that involves "a professionally conducted, thorough pedestrian survey of an entire target area . . . intended to locate and record all historic properties" and that "provides managers and cultural resource specialists with a complete record of cultural properties." BLM Manual 8110.2.21.C.1, C.3. This alternative requires an on-the-ground survey of the entire subject area. The Manual explains that an "[i]ntensive survey is most useful when it is necessary to know precisely what historic properties exist in a given area." BLM Manual 8110.2.21.C. The Class III survey is the most frequently employed method of inventory. *See* BLM Manual 8110.2.21.

BLM has also issued an instruction memorandum for complying with the NHPA when preparing transportation plans. *See* BLM Instruction Memorandum No. 2007-030

(Dec. 15, 2006).[10]  The memorandum suggests that a Class I survey will suffice when a transportation plan proposes to maintain the status quo, but that a Class III inventory should be used when a plan authorizes new roads or increased traffic on existing roads:

> Proposed designations that *will not change or will reduce OHV use* are unlikely to adversely affect historic properties and *will require less intensive identification efforts*. These include designations that (1) allow continued use of an existing route; (2) impose new limitations on an existing route; (3) close an open area or travel route; (4) keep a closed area closed; or (5) keep an open area open. . . .

> Where there is a *reasonable expectation that a proposed designation will shift, concentrate or expand travel into areas where historic properties are likely to be adversely affected, Class III inventory* and compliance with section 106 [of the NHPA], focused on areas where adverse effects are likely to occur, *is required* prior to designation.

*Id.* (emphasis added).

Here, BLM conducted a Class I survey.  The agency contracted with North Wind, Inc. to conduct a literature

___

[10] On its face, this instruction memorandum applies only to transportation plans governing off-highway vehicle (OHV) travel.  The parties agree, however, that it governs transportation plans generally.  All parties, moreover, appear to view this memorandum as authoritative.

review of previous surveys of the Monument.  The literature obtained by North Wind showed that in the past, 336 projects had examined approximately 44,270 acres in the Monument area.  These projects generally dated to the 1960s and 1970s and had identified 383 historic sites within the Monument, including 192 sites on public land.[11]   In addition to identifying these previously recorded sites, North Wind identified 135 additional potential historic sites by reviewing General Land Office and topographic maps.  North Wind also reviewed ethnographic literature to identify areas of Native American spiritual concern.  Neither North Wind nor BLM conducted any Class II or Class III surveys.

North Wind reported the results of its review in a 164-page report. North Wind's report included a recommendation that BLM conduct a Class III survey:

> The review concludes with the observation that over half the sites were recorded in the 1960s and 1970s.  Generally, these site forms lack proper site descriptions, site sketches and topographic maps with site locations.  The combination of minimal site information, inconsistent survey methods and a dynamic Missouri River that has probably eroded away known cultural resources and exposed new cultural resources suggests that a Class III cultural resource inventory be conducted in

---

[11] The Monument includes about 375,000 acres of BLM land, 80,000 acres of private land and 39,000 acres of state land.

> the [Monument] to locate and record cultural
> resources to today's standards.

BLM has not done so.

BLM reviewed the North Wind report and incorporated its findings, as well as other information, into an analysis of cultural resources in the FEIS. The FEIS acknowledged that most of the earlier surveys dated to the 1960s and 1970s and covered only 8 to 16 percent of the Monument area.

MWA and TWS contend that BLM failed to make a reasonable and good faith effort to identify historical and cultural resources. MWA argues that BLM was required to conduct a Class III inventory in the areas where historic sites are most likely to be found (the river corridor) and the areas in which historic sites are most likely to be damaged or destroyed (roads, airstrips and dispersed camping sites). TWS argues that BLM should be required to conduct a Class III inventory for the most affected areas, which TWS says are the open road corridors.[12]

The government argues that BLM's reliance on a Class I survey was reasonable and in good faith, citing several considerations:

• Relying on BLM's 2006 instruction memorandum, the government maintains that a Class I inventory was sufficient

---

[12] We reject intervenor-appellees Missouri River Stewards, Fergus County, Phillips County, Chouteau County and Blaine County's argument that the plaintiffs lack standing to assert these claims. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562–63 (1992).

because the RMP allows continued use of *existing* roads and airstrips rather than authorizing new roads and airstrips. The government contends that, by authorizing only existing roads and airstrips, the RMP does not authorize any new surface disturbance that could mar historic sites and objects.

 • The government emphasizes that conducting Class II or Class III surveys of the 375,000-acre Monument would be both time-consuming and expensive.

 • The government says it may conduct more intensive surveys in the future, such as if additional roads are authorized.

 • The government argues that BLM's approach here is consistent with BLM Information Bulletin No. 2002-101 (May 24, 2002), which suggests that a Class I inventory will ordinarily suffice for purposes of general land use planning such as preparation of a resource management plan.

There are, however, a number of reasons to question whether BLM's Class I inventory represents a "reasonable effort" in this case. First, the RMP here is not just any land use plan. It is a land use plan adopted to implement a national monument designated for the very purpose of protecting and preserving historic objects. *See* 16 U.S.C. § 431; 66 Fed. Reg. at 7359–61. In addition, the RMP is not solely a *general* land use plan; it also authorizes *specific* uses, including over 400 miles of roads and ways. The 2002 information bulletin upon which the government relies specifies that "a more detailed level of identification of the scope and nature of cultural resources" may be required when

land use planning entails specific impacts.[13]  *See also* BLM Manual 8110.06.D (providing that inventories should take place using the "methods and at a level commensurate with the nature of the proposed undertaking and its likely effects on the protection and management of the cultural resources").

Second, as the government concedes, only 8 percent of Monument lands have been subject to Class III inventories, and only 16 percent of the Monument has been subject to Class II or Class III inventories.  *See* Answering Br. of Federal Defendants-Appellees, No. 11-35818, at 59.  Most of these inventories are four decades old.  "Given the age and inconsistencies of work performed in the project area," North Wind recommended "that a Class III cultural resources inventory be conducted . . . to locate and record previously recorded sites to today's standards and to ascertain the existence of potential historic sites."  The State of Montana also commented that "[f]urther investigations of cultural and historic sites are necessary to develop strategies for their protection."

---

[13] BLM Information Bulletin No. 2002-101 provides:

> The scope and scale of cultural resource identification are much more general and less intensive for land use planning than for processing specific land use proposals.  Instead of new, on-the-ground inventory, the appropriate identification level for land use planning is a regional overview; i.e., (1) a compilation and analysis of reasonably available cultural resource data and literature, and (2) a management-oriented synthesis of the resulting information.  (See Manual Section 8110.)  If land use decisions, however, are more specific in terms of impacts, they may require a more detailed level of identification of the scope and nature of cultural resources during land use planning.

Third, the government's reliance on the 2006 instruction memorandum is unpersuasive.    Although the 2006 memorandum provides that proposed designations that will not change or will reduce motorized vehicle use ordinarily will require less intensive identification efforts, it also provides that "[p]roposed designations of new routes or new areas as open to OHV use will require Class III inventory." The plaintiffs argue persuasively that ways in the Monument are more akin to new routes than existing routes because they have never been subject to an NHPA survey previously.  As BLM acknowledged in the FEIS, the user-created roads and ways within the Monument were, before the RMP, "not federal undertakings and therefore have not required Section 106 surveys."  For purposes of the 2006 memorandum, then, the roads and airstrips within the Monument may be best understood as *new* rather than *existing* impacts.  As TWS explains: "Unlike the usual case, where the existing routes have been analyzed before and where redundant analysis would be pointless, the impacts of the user-created routes in the Monument have never been analyzed."    Appellants' Reply Br., No. 11-35821, at 15.

Fourth, even if the RMP is viewed as continuing existing routes rather than designating new ones, the 2006 instruction memorandum provides that a Class III inventory is required "[w]here there is a reasonable expectation that a proposed designation will shift, concentrate or expand travel into areas where historic properties are likely to be adversely affected." The RMP closes 201 miles out of 605 miles of roads and ways (and closes another 111 miles seasonally), closes four out of 10 airstrips (and closes a fifth seasonally) and allows dispersed camping within 50 feet of a road as opposed to within 300 feet under pre-RMP rules.  These consolidations

will *concentrate* pre-RMP traffic on the remaining designated roads, airstrips and camping areas.

The RMP, therefore, concentrates travel into areas in which historic sites will be adversely affected. The FEIS recognizes that increased use can damage historical objects and sites. It says that "[t]he potential exists for vehicle traffic and associated camping activities to affect cultural resources, particularly prehistoric sites. Possible effects include artifact displacement, breakage, compaction, and stratigraphic mixing of various cultural assemblages, as well as increased erosion potential, site exposure, and vandalism." The FEIS adds that "[o]pen roads used during wet periods may grow in width through avoidance of muddy or deeply rutted stretches, which may lead to increased ground disturbance and increase the risk to prehistoric sites and historic ruins adjacent to travel routes." The memorandum's Class III survey requirement for concentrated travel therefore applies here.

Fifth, the government's promise to complete Class II and Class III surveys *in the future* – in connection with future, site-specific decisions involving new disturbances such as the designation of new roads – does not substitute for a more intensive survey now. The plaintiffs point out that the threat to historic sites is posed by *existing* authorized uses; the government's promise to evaluate future projects, though important, does nothing to assuage those concerns.

In light of these considerations, we hold that BLM failed to make a reasonable effort to identify historical and cultural resources. Consistent with BLM's own policy documents, BLM is required to conduct Class III inventories for roads, ways and airstrips that have not been surveyed previously or were surveyed decades ago. Because we hold that the NHPA

requires Class III surveys solely with respect to roads, ways and airstrips, the government's concerns about the costs of surveying the entire 375,000-acre Monument do not apply.

We recognize that North Wind also recommended a Class III survey for the Missouri River, observing that "a dynamic Missouri River that has probably eroded away known cultural resources and exposed new cultural resources suggests that a Class III cultural resource inventory be conducted . . . to locate and record cultural resources to today's standards." These threats to historic and cultural resources, however, arise from the natural flow of the river, not from activities authorized by the RMP. Thus, although a Class III survey of the river is advisable for the reasons given by North Wind, we cannot say that the NHPA required it as a precursor to issuance of the RMP.

## B.  Consultation

NHPA regulations require agencies to consult with state and tribal historic preservation officers throughout the § 106 process. *See* 36 C.F.R. §§ 800.4(a)–(c), 800.5(a), 800.6(a), 800.16(f). We reject TWS's argument that BLM violated these regulations here by failing to consult closely with the Montana State Historic Preservation Officer (SHPO). The record shows that BLM coordinated and collaborated with the SHPO in developing the cultural resources analysis for the EIS and the RMP. To the extent the SHPO's involvement was limited, this was the SHPO's choice, not the result of BLM's failure to provide the SHPO with opportunities to participate. In contrast to *Pueblo of Sandia v. United States*, 50 F.3d 856, 858–62 (10th Cir. 1995), and *Quechan Tribe of Fort Yuma Indian Reservation v. U.S. Department of the Interior*, 755 F. Supp. 2d 1104, 1111, 1118–19 (S.D. Cal.

2010), in which the consulting parties complained about a lack of adequate consultation, the SHPO has not complained here. Because BLM consulted the SHPO and afforded the SHPO an opportunity to participate in the process, there was no violation of the regulations. *Cf. Te-Moak Tribe*, 608 F.3d at 609 (finding no consultation violation where BLM provided the tribe with a sufficient opportunity to identify its concerns about historic properties).

## CONCLUSION

We conclude that the district court properly granted summary judgment in favor of the defendants on the plaintiffs' FLPMA and NEPA claims. We hold that the court erred by granting summary judgment in favor of the defendants on the plaintiffs' NHPA claim. We vacate that portion of the judgment and remand with instructions to enter judgment in favor of the plaintiffs on the NHPA claim and to enter an appropriate order requiring BLM to conduct Class III surveys with respect to roads, ways and airstrips that have not been subject to recent Class III surveys. Each party shall bear its own costs of appeal.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**

GOULD, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion's discussion of the National Environmental Policy Act and the National Historic Preservation Act. I also join the majority's discussion of the

Resource Management Plan's (RMP) compliance with the Federal Land Policy and Management Act of 1976 (FLPMA) and the Proclamation insofar as it concludes (1) that the RMP did not violate the requirement that Wilderness Study Areas remain roadless and unimpaired and (2) that allowing parking and dispersed camping within 50 feet of roads is reasonable under the administrative-purpose exception to the Proclamation's off-road travel ban. But I part company with the majority's conclusion that the RMP's definition of "road" for purposes of the off-road travel ban is reasonable.

The Proclamation requires the Bureau of Land Management (BLM) to prepare a transportation plan that "prohibit[s] all motorized and mechanized vehicle use off road," for the express "purpose of protecting the objects" of the Monument. Proclamation No. 7398, 3 C.F.R. § 7398 (2002). The off-road travel ban is intimately tied to the Proclamation's protection of Monument objects and to its goal of maintaining the "remote" and "undeveloped" nature of the Monument. *Id*.

The Proclamation did not define "road" or "off road." The RMP defined a "road" as "a linear route segment that can be created by the passage of vehicles (two-track); constructed; improved; or maintained for motorized travel." Under this definition, the Proclamation's off-road travel ban will not be violated by a vehicle traveling on a two-track—a route "where perennial vegetation is devoid or scarce, or where wheel tracks are continuous depressions in the soil yet evident to the casual observer." I conclude that BLM's adoption of this definition of "road" violates the Proclamation, FLPMA, and the Administrative Procedure Act (APA) because BLM did not explain how its expansive

definition of "road" serves the Proclamation's essential purpose of protecting Monument objects.

The majority upholds BLM's definition of "road" in the RMP based in part on the deference that we give BLM's interpretation of the Proclamation and the majority's conclusion that the RPM's "road" definition is "not unreasonable on its face." True, we owe deference to BLM's interpretation of the Proclamation. *See Kester v. Campbell*, 652 F.2d 13, 15 (9th Cir. 1981). But even with deference, I disagree that BLM's definition of "road" can survive APA review. Under the APA, an "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). BLM did not do that here. The RMP does not explain why the selected definition of "road" for the transportation plan and the off-road travel ban serves the purpose of protecting Monument objects. That is enough to invalidate the BLM's process on this point. But if there were any doubt, it should be dispelled by the common-sense understanding that vehicle travel on the primitive two-track routes can only impair the objects that the Proclamation sought to protect. To define roads so broadly is to strip the off-road travel ban of its significance for the Monument.

The national monument designation changed the status quo for the Upper Missouri River Breaks area, elevating protection of the "biological, geological, and historical objects of interest." 3 C.F.R. § 7398 (2002). But the definition of "road" adopted in the RMP for the off-road travel ban maintains the same definition of road employed in the two RMPs that previously governed the area, the Judith

Valley Phillips RMP and the West HiLine RMP. The Monument RMP does not explain why this broad definition of "road" best serves the Proclamation's purpose.

If BLM had consistently used one definition of "road," it might be fine for it to use that definition here without explanation. But that is not the case. The RMP, itself, employs two different definitions of road, one for the off-road travel ban and one for Wilderness Study Areas. The Wilderness Study Area road definition is derived from FLPMA's legislative history, which defined roads as routes "improved and maintained by mechanical means to insure relatively regular and continuous use." H.R. Rep. No. 94-1163, at 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6175, 6191. Ways, by contrast, were defined as routes "maintained solely by the passage of vehicles." *Id.* These definitions of "roads" and "ways" were also used in the BLM's 9100 Engineering Manual, which was in effect at the time of the Proclamation. Because BLM had more than one viable definition of "road" to choose from—one that included two-track routes and one that did not—its failure to explain how its selected definition of "road" best serves the Proclamation's goals of protecting Monument objects is troubling and does not bode well for preservation.

This concern is magnified by the confusion surrounding the definition of "road" during the development of the RMP. The record contains correspondence between BLM employees working on the RMP debating what definition of road should be adopted in the RMP. And the State of Montana expressed concern about the inclusion of "two-track" routes in the RMP definition of "road" because it contributed to "very high road density given that the Monument designation was based on its remote nature and its

'wild country.'"  The State of Montana's concern shows that it is at least debatable whether BLM's adoption of the more expansive "road" definition comports with the Proclamation's purpose.  BLM might have settled the debate by giving sound reasons for why the RMP's definition of "road" protects Monument objects.  But it did not.

The Government argues that the rationale for the RMP's "road" definition can be discerned through references to BLM Manual 9113 and road inventory guidelines and that its adopted definition adheres to national guidance for defining roads.  This argument misses the mark.  The issue is not that the RMP's definition of "road" is unreasonable in and of itself; defining roads to include two-tracks may be reasonable in many contexts.  Rather, the issue is that BLM adopted a broad definition of "road" without explaining how that definition best protects Monument objects and advances the goals behind the off-road travel ban.  A common-sense review yields concern that the RMP's definition could impair these objects.  This concern is not alleviated by anything in the record that explains or supports the conclusion that including "two-tracks" in the RMP's definition of "road" advances the Proclamation's goals of preservation and protection.  I would hold that, on this record, the RMP's definition of "road" violates the Proclamation, FLPMA, and the APA because BLM has not "articulate[d] a satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n, Inc.*, 463 U.S. at 43.